UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

RAMON RODRIGUEZ,

                Plaintiff,

-vs-                             Case No.  5:08-cv-204-Oc-10GRJ

CITY OF CLERMONT, CITY OF
CLERMONT POLICE DEPARTMENT,
JEFFREY RADI, in his official and
individual capacity,

                Defendants.

_____

# **O R D E R**

The Plaintiff is a police officer employed by the City of Clermont Police Department. He alleges that the Defendants - the City and his prior supervisor (Jeffrey Radi) - discriminated and retaliated against him on the basis of his national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution, and the Florida Civil Rights Act of 1992, Fla. Stat. § 760.11 ("FCRA").

The case is presently before the Court for consideration of Defendant Jeffrey Radi's Motion for Summary Judgment (Doc. 42), and Defendants City of Clermont and City of Clermont Police Department's motion for summary judgment (Doc. 45). The Plaintiff has filed timely responses in opposition to each motion (Docs. 48, 51). For the reasons

discussed below, the Court concludes that both motions are due to be granted in part and denied in part.

## Undisputed Material Facts

Plaintiff Ramon Rodriguez is a native of Puerto Rico. He has been employed as a police officer by the City of Clermont Police Department ("CPD") since January 20, 2004. He is fluent in Spanish. English is his second language.

The majority of Rodriguez's complaints center around a six (6) month period when he was supervised by Defendant Sergeant Jeffrey Radi. Rodriguez transferred to Radi's police squad in July of 2006. Although Rodriguez admits he and Radi had a generally good working relationship, Rodriguez contends that Radi continuously treated him differently from other police officers in the squad due to Rodriguez's Puerto Rican heritage. For example, if Rodriguez was taking a bit longer to complete his reports, Radi would tell Rodriguez that he was taking too long and to "hurry up." Radi also would raise his voice when he talked to Rodriguez, and would make Rodriguez repeat what he was saying. Rodriguez contends that Radi in fact understood what Rodriguez was saying, but was making Rodriguez's accent the subject of ridicule.

Rodriguez also points to times when Radi would not permit Rodriguez to return to CPD headquarters to complete reports, but acknowledges that Radi denied the requests when the squad was short-staffed or too busy, and that Radi denied the same requests made by other officers. On another occasion, Rodriguez was having a private conversation

with Sergeant Rene Castro in Spanish, and Radi walked by and said to both of them "hey, speak English, this is America."

At the beginning of Rodriguez's shift on September 22, 2006, Radi informed Rodriguez in front of three other officers that Rodriguez would prepare all of the written reports for the entire squad for the day so that Rodriguez would learn how to either "write reports" or "write English."[1]  Rodriguez then met with Radi in private, at which time Radi repeated that Rodriguez would prepare all of the police reports to help improve his writing ability.  Radi also suggested that Rodriguez take an English class to assist him in his report writing skills, and stated that Defendant City of Clermont ("City") would pay for the class and for Rodriguez's time.  Rodriguez rejected Radi's offer.

Later that day, Rodriguez asked Radi for permission to speak with his next level supervisor, Lieutenant Blackman.  Radi denied Rodriguez permission to talk to Blackman about Radi's request that Rodriguez complete all reports for the shift, but granted Rodriguez permission to speak to Blackman about any other matter.  Rodriguez ignored Radi's directive, and complained to both Sergeant Castro and Blackman about the report writing.  Rodriguez explained to both Castro and Blackman that he felt humiliated and embarrassed by Radi's directive.  Blackman ultimately overruled Radi's decision, and Rodriguez did not write all of the reports for the squad that day.  Radi never made this request of Rodriguez again.

---

[1] Rodriguez is not sure whether Radi said "write reports" or "write English," but thinks it was the latter.

Rodriguez testified at his deposition that Radi had never previously complained about Rodriguez's writing abilities. However, Radi testified in his affidavit that Rodriguez's police reports were poorly drafted, omitted critical information, and were difficult to comprehend. Radi further stated that he spent a significant amount of time with Rodriguez reviewing, discussing, and correcting Rodriguez's police reports, and that CPD Chief of Police Steve Graham had mentioned to Radi that Rodriguez's reports were difficult to read.[2] Other supervisors also counseled Rodriguez on numerous occasions about his poor writing and communication skills, and his prior evaluations suggested that his report writing could use some improvement.

Rodriguez was concerned that Radi would retaliate against him for complaining to Lieutenant Blackman. Following the report incident, Radi began to complain about the Latin music Rodriguez listened to in his police car. Every time Radi would get into Rodriguez's car, Radi would make comments such as "how could you listen to that?" "I don't understand what they are saying," or "What kind of music is that?" Radi never ordered Rodriguez to turn the music off, but Rodriguez considered these statements to be both racist and retaliatory. In addition, whenever Rodriguez would turn in a report, Radi would say "let me go ahead and grab the red pen to correct your Spanglish."[3] According

---

[2]Graham also recommended that Rodriguez attend a grammar class, as well as a community relations class. There is no evidence that Rodriguez attended either class, however Rodriguez claims he attended an advanced report writing course, which the City paid for.

[3]The term "Spanglish" is defined as "Spanish characterized by numerous borrowings from English." Webster's II New College Dictionary 1057 (1995). According to Rodriguez, the term
(continued...)

to Rodriguez, Radi repeatedly used the term "Spanglish" in front of Rodriguez, and made other derogatory comments at least two to three times per week for the entire time Rodriguez was in Radi's police squad. Rodriguez also points to two instances where Radi appeared at a restaurant where Rodriguez was having lunch with his wife and son, and told Rodriguez to hurry up because the squad was shorthanded.

In January 2007, Radi prepared Rodriguez's annual evaluation and noted that Rodriguez needed to work on the quality and speed of his report writing. Under the section entitled "Goals to be Accomplished During the Next Evaluation Period" Radi stated:

> I would like to see Officer Rodriguez focus on his report writing. I have continued to assist him with his reports. I have sat down and talked with Officer Rodriguez about his report writing. He tells me that he understands what I am saying, but continues to have problems with punctuation, grammar, and spelling. He states that he is trying, but he writes in "spanglish," which he says he is still trying to improve.

Doc. 43-5, p. 6. Radi gave Rodriguez a total evaluation score of 35, which would have entitled him to a 2% pay increase.[4]

---

[3](...continued)
"Spanglish" is an insult and derogatory if it is said by anyone who is not Hispanic. Rodriguez claims that he does not know how Radi learned of the term "Spanglish." However, Radi testified that it was Rodriguez who first introduced Radi to the term, and Rodriguez has admitted that he uses the term himself and would joke about the term with other Hispanic officers. Moreover, Sergeant Kimberly Meintzschel, one of Rodriguez's prior supervisors, stated that when she discussed with Rodriguez the deficiencies in his report writing, Rodriguez told Meintzschel she did not understand Rodriguez's use of "Spanglish." Doc. 45-3, pp. 1-2.

[4]A score of between 34 and 68 entitled patrol officers and investigators to a 2% pay increase. A score of 33 or below resulted in no pay increase. Doc. 43-5, p. 7.

Pursuant to CPD policy, Radi submitted the evaluation to Chief Graham for final approval. Graham requested that Radi reduce his initial evaluation of Rodriguez due to several citizen complaints Graham had received about Rodriguez, as well as Rodriguez's poor report writing. Radi complied with Graham's directive, and lowered Rodriguez's total evaluation score to 33.[5] This lower score disqualified Rodriguez from any pay increases. Rodriguez had never received such a low score on an evaluation in the past, and had always qualified for pay raises in prior years.[6] Moreover, in his January 2006 evaluation, Rodriguez received a score of "Outstanding" for his interpersonal relations, and he received six commendations for his relations with the community and CPD between January and November 2006.

Rodriguez met with Graham and the City Manager, Wayne Saunders, to dispute the evaluation. Graham ultimately agreed to amend the evaluation, but refused to change the numerical score, therefore Rodriguez did not receive a pay raise in 2007. Rodriguez had the ability to further appeal his evaluation to the City Commission, but there is no evidence that Rodriguez took advantage of this option. There is also no evidence establishing that Rodriguez was aware at the time that Graham had directed Radi to lower the evaluation.

---

[5]Radi also added in the "Overall Comments" section that Rodriguez "has the potential to be a solid leader for newer personal [sic] in the department. I expect Officer Rodriguez to continue improving in all areas of being a police officer and eventually enter the field training program." Doc. 43-6, p. 6.

[6]Since transferring from Radi's squad, Rodriguez has received two additional evaluations, and was scored high enough on both to qualify for pay raises.

Instead, in March 2007, after Rodriguez transferred out of Radi's squad, Rodriguez filed an internal affairs complaint against Radi, claiming hostile work environment and racial discrimination. Road Sergeant Michael McMaster conducted an investigation into Rodriguez's complaint from March 2007 through August 20, 2007, during which time he interviewed 15 individuals, including Rodriguez, Sergeant Castro, and Radi. McMaster ultimately concluded that while Radi should have at times used different language, and that most of the participants in the investigation treated each other in less than a desirable manner in certain circumstances, a preponderance of the evidence did not support Rodriguez's complaint.[7] Rodriguez disputes the conclusion of McMaster's report, and claims that McMaster held a grudge against Rodriguez from a prior incident where McMaster received a low score on an annual evaluation. There is no evidence that Rodriguez appealed the investigation results.

Rodriguez claims that his low evaluation prevented him from receiving any promotions, and testified that Sergeant Castro and other officers told him he would have received a promotion but for the evaluation. In March 2007, two months after he disputed his low evaluation,[8] Rodriguez applied for a Field Training Officer position, which Graham

---

[7]See Doc. 48-3. During the course of his investigation, McMaster received a second complaint against Radi by Communications Officer Stephanie Hernandez, who complained that Radi criticized everything she did, and that the criticism was racially motivated. McMaster investigated Hernandez's complaint and concluded that it also was not sustained by a preponderance of the evidence.

[8]It is unclear from the record whether Rodriguez applied for this position before or after he made his internal affairs complaint.

denied.[9]   Graham contends that he made this decision based on Rodriguez's poor performance.  Rodriguez again applied for the Field Training Officer position at a later unspecified date, which was also denied.  Rodriguez testified that at some point after he challenged his January 2007 evaluation, Chief Graham told Rodriguez that he would never be promoted to the position of Field Training Officer.[10]

In January 2007 Rodriguez voluntarily transferred to another squad supervised by Sergeant Holmes.  Rodriguez's job duties, hours, and compensation did not change.  Rodriguez later transferred to another squad supervised by Sergeant Mark Edwards, where he remains to date.

Rodriguez contends that he was so traumatized and humiliated by Radi's conduct toward him that he began to second guess himself at work and would forget how to perform job duties that he normally accomplished without difficulty.  On one occasion, after he had transferred out of Radi's squad, Rodriguez became so upset when he learned Radi would be his substitute supervisor for a shift, he suffered a mini-stroke which required hospitalization.

---

[9]Even though Rodriguez alleged that Radi denied him a promotion to Field Training Officer, it is undisputed that Rodriguez never applied for this position while under Radi's supervision.  It is also undisputed that Radi twice approved Rodriguez to attend Field Training Officer courses, and that Radi believed Rodriguez would ultimately be promoted to that position.  Rodriguez also alleged in his Amended Complaint that Graham hired a lesser trained, lesser qualified white officer with less seniority than Rodriguez for the Field Training Officer position.  However, the record is devoid of any evidence establishing this allegation.

[10]It is undisputed that the ultimate authority and discretion for all hiring, firing, promotion, and pay raise decisions rests with Chief Graham - Radi and other supervisors can make recommendations but otherwise have no authority.

## Procedural History

On May 10, 2007, Rodriguez filed a complaint with the Equal Employment Opportunity Commission alleging race and national origin discrimination and retaliation. Doc. 45-9. After receiving his Notice of Right to Sue letter, Rodriguez timely filed a seven-count Complaint against the Defendants in this Court on May 23, 2008 (Doc. 1). Pursuant to the Court's February 17, 2009 Order (Doc. 20), Rodriguez filed an Amended Complaint on March 9, 2009 (Doc. 21).

The Amended Complaint, which governs this case, consists of seven counts: (1) a claim of national origin discrimination against Radi in his individual capacity pursuant to 42 U.S.C. § 1983 (Count I); (2) a claim of discriminatory customs, policies, and practices against all Defendants under 42 U.S.C. § 1983 (Count II); (3) a claim that the Defendants violated Rodriguez's Fourteenth Amendment right to procedural due process (Count III); (4) claims against the City and CPD for national origin discrimination under Title VII and the FCRA (Counts IV and VI); and (5) claims of retaliation under Title VII and the FCRA against the City and CPD (Counts V and VII).[11]

---

[11]Although Rodriguez alleges his Title VII retaliation claim and both FCRA claims against all three Defendants, the Court previously dismissed all Title VII and FCRA claims asserted against Radi with prejudice (Doc. 20, p. 11). The Court will therefore presume that any reference to Radi in Counts V-VII of the Amended Complaint is in error and the Court will not further consider any such claims against Radi.

## **Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. Celetex, 477 U.S. at 324. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

<u>**Discussion**</u>

I.    <u>Defendant Radi's Motion for Summary Judgment</u>

**A.    Count I - National Origin Discrimination Under 42 U.S.C. § 1983**

Rodriguez claims that Radi discriminated against him based on his national origin in violation of his Fourteenth Amendment right to Equal Protection, and seeks to hold Radi individually liable for this discrimination. Radi contends that he is entitled to qualified immunity, and that summary judgment should be entered in his favor.

To establish qualified immunity, a government official must first show that he was engaged in a "discretionary function" when he committed the allegedly unlawful acts. <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1263-64 (11th Cir.2004). If the official acted within his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted). The plaintiff must then satisfy a two-prong test: (1) that the defendant violated a constitutional right; and (2) that this right was clearly established at the time of the violation. <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). "Clearly established" is defined as whether "it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 202, 121 S.Ct. at 2156. "If the plaintiff prevails on both prongs of this test, then the defendant is unable to obtain summary judgment on qualified immunity grounds." <u>Holloman</u>, 370 F.3d at 1264.

The Parties do not dispute that Radi acted within the scope of his discretionary authority. Thus, the Court need only consider whether Rodriguez has satisfied the two-prong test. Earlier this year, the Supreme Court held that courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Pearson v. Callahan</u>, 555 U.S. ___, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). In light of the facts at hand in this case, the Court finds that it is appropriate to first address whether a constitutional violation actually occurred.

In order to establish a violation of the Equal Protection Clause, Rodriguez must prove discriminatory motive or purpose behind the alleged discriminatory conduct. <u>Cross v. Alabama</u>, 49 F.3d 1490, 1507 (11th Cir. 1995). Rodriguez's claim focuses on two categories of allegedly discriminatory conduct: (1) the 2007 evaluation, which resulted in the loss of a pay raise for that year; and (2) Radi's constant harassment and discriminatory behavior towards Rodriguez.[12]

Rodriguez's claim with respect to the 2007 evaluation fails because Radi did not engage in any discriminatory conduct. The evidence is undisputed that Radi was not the official decision-maker ultimately responsible for Rodriguez's poor evaluation, or the

---

[12]In his Amended Complaint, Rodriguez also alleges that Radi failed to promote him to Field Training Officer. However, the evidence is undisputed that Rodriguez never applied for the position while he was under Radi's supervision. Moreover, a review of the pretrial statement (Doc. 71), as well as Rodriguez's counsel's statements at the December 16, 2009 pretrial conference make clear that Rodriguez is no longer pursuing this portion of his § 1983 claim.

resulting loss of his pay raise. He initially scored Rodriguez high enough to obtain a pay raise - it was Chief Graham who ordered Radi to lower the evaluation. Radi was only following Graham's directives, and there is no evidence that Radi influenced Graham's decision in any way. It was also Graham who refused to change the evaluation's numerical score in order to permit Rodriguez to receive a raise. Moreover, there is evidence in the record that pursuant to CPD policies, Graham had the sole discretion to determine which officers would receive merit pay raises. See Doc. 45-5, Ex. 1.

Because Radi was not the official decision maker both for the 2007 evaluation and the resulting denial of a pay raise, he did not violate Rodriguez's constitutional rights. Summary judgment shall be granted in Radi's favor as to the portion of Count I relating to the 2007 evaluation. See Kamensky v. Hillsborough County, 148 Fed. Appx. 878, 879 (11th Cir. 2005); Quinn v. Monroe County, 330 F.3d 1320, 1326 (11th Cir. 2003); Redding v. Tuggle, No. CIVA105CV-2899WSDLTW, 2007 WL 2462641 at ** 28-29 (N.D. Ga. July 11, 2007).

For the second portion of his discrimination claim against Radi, Rodriguez points to: (1) Radi's comments to Rodriguez to "hurry up" when Rodriguez was slow to complete tasks: (2) Radi raising his voice to Rodriguez and asking Rodriguez to repeat himself because Radi could not understand him; (3) Radi refusing to allow Rodriguez to return to CPD headquarters to complete reports when the squad was short staffed; (4) Radi telling Rodriguez and another officer to "speak English, this is America;" (5) Radi's September 22, 2006 request that Rodriguez complete all written reports for an entire shift; (6) Radi's

repeated comments that Rodriguez used "Spanglish" and continuous editing of Rodriguez's reports; (7) Radi's comments about Rodriguez's Latin music; and (8) Radi telling Rodriguez to hurry up and finish his lunch with his family. All of these incidents took place during the approximately six (6) month period Radi was Rodriguez's immediate supervisor.

Although Rodriguez couches these allegations as equal protection "harassment," his claim is akin to a Title VII claim of national origin based hostile work environment harassment.[13] There is admittedly no tangible adverse employment action in this portion of Rodriguez's claim - he was not fired or denied any employee benefit. Rather, Rodriguez is arguing that Radi's constant harassment itself created a hostile work environment for which Rodriguez suffered harm and is entitled to compensation.[14]

Employment discrimination claims brought under the Equal Protection Clause and § 1983 apply the same standards of proof and analytical framework utilized in claims brought under Title VII. Bryant v. Jones, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009); Watkins v. Bowden, 105 F.3d 1344, 1355 (11th Cir. 1997); Cross, 49 F.3d at 1507-08. Thus, even though this claim does not follow the standard *prima facie* case for a hostile work environment, the Court finds that Title VII jurisprudence in this area provides the appropriate guidance to analyze Rodriguez's claim.

---

[13]See, e.g., Doc. 21, ¶¶ 60(f) "RADI promoted and fostered a hostile work environment by his daily ridiculing RODRIGUEZ in front of his fellow officers about his language skills and his national origin."

[14]Cf. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1277 (11th Cir. 2002) ("The Supreme Court has cautioned that harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable.").

A hostile work environment exists under Title VII where an employee demonstrates that the harassing behavior was "sufficiently severe or pervasive to alter the conditions of [his] employment." Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S.Ct. 2342, 2347, 159 L.Ed.2d 204 (2004). This element consists of both an objective and subject component, and the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] to be abusive." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367, 370-71, 126 L.Ed.2d 295 (1993)). To determine whether an environment is objectively hostile and abusive, the Court looks at factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere's with an employee's work performance." Harris, 510 U.S. at 23, 114 S.Ct. at 371. No one factor is determinative; the Court takes a "totality of the circumstances approach. . . . " Mendoza v. Borden, 195 F.3d 1238, 1246 (11th Cir. 1999).

While this is a close case, taking the evidence in the light most favorable to Rodriguez, the Court concludes that genuine issues of material fact exist as to whether Rodriguez's constitutional rights were violated through the creation of a hostile work environment. Rodriguez has presented evidence that Radi made comments several times a week which focused on Radi's accent, his use of Spanish in the workplace, his taste in Latin music, and his use of "Spanglish" in his reports. There is also undisputed evidence

15

that Radi singled Rodriguez out in front of several other squad members and criticized his ability to write in English. A reasonable person could find such constant comments and actions, when viewed as a whole, to be abusive, hostile, and based on national origin. Moreover, Rodriguez testified that he felt humiliated and embarrassed by Radi's actions, that he considered Radi's comments to be discriminatory, and that Rodriguez's job performance suffered as a result. Rodriguez also filed an internal affairs complaint against Radi alleging a hostile work environment. To be sure, Radi has presented evidence in an attempt to refute and/or explain these incidents, but such evidence merely highlights the factual disputes and credibility issues which can only be resolved by a jury at trial. See Miller, 277 F.3d at 1276-77; Brewster v. City of Poughkeepsie, 447 F. Supp. 2d 342 (S.D.N.Y. 2006). Summary judgment is meant to "police [that] baseline for hostile environment claims," and the Court concludes that the acts alleged in this claim satisfy that baseline. Mendoza, 195 F.3d at 1244.

Having found that material issues of fact remain with respect to whether a violation of Rodriguez's constitutional rights occurred, the next step in the qualified immunity analysis is to determine whether, assuming a jury could find that Radi created a hostile work environment, the unlawfulness of his actions was clearly established. This does not mean, however, that "the very action in question has previously been held unlawful;" rather, it means only that the "unlawfulness" of the action must have been apparent "in the light of pre-existing law." Williams v. Consolidated City of Jacksonville, 341 F.3d 1261, 1269-70 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515, 153

L.Ed.2d 666 (2002)). Under on the facts of this case, it is clear that the unlawfulness of creating a hostile work environment based on Rodriguez's national origin was apparent in the light of pre-existing law. See Bibb County, 223 F.3d 1231, 1237 (11th Cir. 2000); Busby v. City of Orlando, 931 F.2d 764, 775-776 (11th Cir. 1991); Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1478 (11th Cir. 1991).

Because Rodriguez has presented sufficient evidence as to both prongs of the qualified immunity analysis, summary judgment will be denied as to the hostile work environment portion of Count I.[15]

## B.    Other Claims Alleged Against Radi

Rodriguez lists all three Defendants in Count II, his municipal liability claim under §1983 that the Defendants established and maintained a widespread custom, policy, or practice of discriminating against individuals based on their national origin. Liability for such claims - which is § 1983's alternative to vicarious or respondeat superior liability - rests solely with the municipal defendants, Monell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658, 690-92, 98 S.Ct. 2018, 2036-37, 56 L.Ed.2d 611 (1978), and the Court is unaware of the existence of such a claim against a lone employee in his individual capacity. It appears

---

[15]The same material issues of disputed fact which preclude summary judgment as to the existence of a hostile work environment also preclude summary judgment on Rodriguez's request for punitive damages from Radi. The Court simply cannot resolve at this time whether Radi acted with a discriminatory motive or with indifference to Rodriguez's protected rights.

that Rodriguez listed Radi in Count II in error, and summary judgment shall therefore be granted in Radi's favor.[16]

Similarly, in Count III of his Amended Complaint, Rodriguez asserts that all of the Defendants deprived him of procedural due process, resulting in the loss of his constitutionally protected property rights to merit pay raises and promotion to Field Training Officer. The Court will discuss the merits of this claim with respect to the City of Clermont and CPD below, <u>see</u> pp. 26-29, *infra*, and that analysis applies with equal force to the extent this claim is also against Radi. Summary judgment is further warranted because there is no evidence that Radi deprived Rodriguez of either a promotion or a raise. Accordingly, summary judgment in Radi's favor shall be granted on Count III.

II.    <u>City of Clermont and CPD Motion for Summary Judgment</u>

**A.    Count II - Discriminatory Custom Claim**

Rodriguez first seeks recovery against the City and CPD under § 1983 for violating his constitutional right to be free from national origin discrimination by a public body. There is no respondeat superior liability under § 1983. <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1307 (11th Cir. 2001) (citing <u>Monell</u>, 436 U.S. at 691, 98 S.Ct. at 2036). Thus, a municipality is only liable under § 1983 for constitutional deprivations that are caused by a governmental policy or custom. <u>Id.</u> Moreover, "[i]t is not sufficient for a [municipality's]

---

[16]It is also apparent from the record that Radi does not qualify as an official with "final policymaking authority." <u>See</u> <u>Quinn v. Monroe County</u>, 330 F.3d 1320, 1325 (11th Cir. 2003); <u>Hyath v. City of Decatur</u>, No. Civ. A. 1:04CV1135-JEC, 2006 WL 825779 at * 11 (N.D. Ga. Mar. 28, 2006).

policy to be tangentially related to a constitutional deprivation." Cuesta v. School Board of Miami-Dade County, 285 F.3d 962, 967 (11th Cir. 2002). Instead, "[t]he 'official policy or custom must be the moving force of the constitutional violation in order to establish liability . . . under § 1983.'" Id. (citing Gilmere v. City of Atlanta, 737 F.2d 894, 901 (11th Cir. 1984)). Accordingly, in order to prevail on his constitutional claims against the City and CPD, Rodriguez must show that a policy or custom was the "moving force" behind the alleged national origin harassment and discrimination.

There are three ways to show a governmental policy or custom: (1) an express policy; (2) a widespread practice that is so permanent and well-settled as to constitute a custom; or (3) the act or decision of a municipal official with final policy-making authority. Cuesta, 285 F.3d at 966-68. To support his claim, Rodriguez alleges that the City and CPD had: (1) a widespread custom, policy, or practice of national origin discrimination and harassment based on national origin; (2) a custom, policy, or practice of condoning or tacitly authorizing such discrimination by supervisors and officers against employees of Puerto Rican descent; (3) a custom, policy, or practice of ignoring and/or rejecting complaints of discrimination on the basis of national origin; (4) a custom, policy or practice of failing to properly train employees in matters of national origin discrimination and diversity training; and (5) a custom, policy or practice of treating employees of Puerto Rican descent differently from employees of non-Puerto Rican descent.[17]  In other words,

---

[17]Doc. 21, ¶¶ 66, 69, 78, 79, 81, 91.  Rodriguez also lists religious discrimination in Count (continued...)

Rodriguez contends that the City and CPD permitted a hostile work environment to exist and did nothing to remedy the harassment.

Rodriguez's claim fails because he has not submitted - and the Court cannot find - any evidence in the record to suggest a City or CPD-wide policy or custom of national origin based harassment or discrimination.

Rodriguez concedes that the City and CPD have express policies forbidding national origin discrimination and harassment, and that they maintain an equal employment opportunity policy which includes a grievance procedure to address harassment, including national origin harassment.  Doc. 45-5, Ex. 3.  The policy provides that any employee who believes that he is being harassed by a co-worker, supervisor, or other individual at the workplace, or believes that his employment is being adversely affected by such conduct, should immediately report such concerns to his immediate supervisor.  If the employee is not comfortable complaining to the immediate supervisor, the employee should promptly notify the Administrative Services Director.  The policy mandates that a prompt and impartial investigation will be conducted on all complaints of harassment.  Id.  Thus, Rodriguez cannot show that he was subjected to national origin harassment as a result of an express policy of the City or CPD, because their express policy forbids, and puts in place specific procedures to remedy, such harassment.

---

[17](...continued)
II, but has presented no evidence or made any argument concerning any religious discrimination. The Court will interpret Rodriguez's silence as an abandonment of any such claim.

Neither can Rodriguez show that he was subjected to harassment as a result of an "established custom" of condoning or authorizing national origin harassment or discrimination. In order to establish such a "custom," Rodriguez must present evidence of a "widespread practice that . . . is so permanent and well-settled as to constitute a 'custom or usage' with the force of law." Griffin, 261 F.3d at 1308 (citing Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991). The Eleventh Circuit has further defined the term "custom" to include "deeply imbedded traditional ways of carrying out policy." Fundiller v. Cooper City, 777 F.2d 1436, 1442 (11th Cir. 1985).

Viewing the evidence in the light most favorable to Rodriguez, the most the Court can glean from the record is a single supervisor - Radi - kept a very close watch on Rodriguez's job performance and frequently made inappropriate comments about Rodriguez's writing ability and use of "Spanglish," the speed in which he performed his duties, his taste in Latin music, and use of Spanish at the workplace. There are no allegations that any other co-workers or supervisors engaged in national origin harassment - either generally or specifically towards Rodriguez - and Rodriguez testified that he is unaware of any other employees of Puerto Rican descent who were subjected to offensive, inappropriate or derogatory remarks, or that lodged any complaints of national origin discrimination or harassment with the City or CPD. Rodriguez also has not presented any evidence of any prior incidents or complaints concerning Radi such that would place anyone at the City or CPD on notice of any harassment or discrimination. This is insufficient to establish that the City and CPD had a widespread practice of condoning

national origin harassment or discrimination.  Cf. Griffin, 261 F.3d at 1308-09.[18]  See also

Thompson v. Spears, 336 F. Supp. 2d 1224, 1236 (S.D. Fla. 2004) (holding that a plaintiff

must produce more than his own claims to prove a custom under § 1983); Engelleiter v.

Brevard County Sheriff's Dept., 290 F. Supp. 2d 1300, 1313-14 (M.D. Fla. 2003) (same).

According to Rodriguez, the other custom at issue in this case relates to his internal

affairs complaint against Radi.  Rodriguez asserts that CPD's investigation of the complaint

was a "sham" conducted by an officer with a "grudge" against Rodriguez.  As evidence of

this theory, Rodriguez asserts that even though the investigator confirmed all of

Rodriguez's allegations of harassment, he ultimately concluded that Rodriguez's complaint

was not supported by a preponderance of the evidence.  Rodriguez claims that the only

way the investigator could have reached such a result was due to the investigator's bias

against him, and the City and CPD's custom and practice of ignoring all complaints of

national origin harassment and discrimination.

This argument fails for two reasons.  First, it again is limited solely to facts involving

a single employee - Rodriguez - and arguably Communications Officer Stephanie Hernandez.

---

[18]Rodriguez stated - without any corroborating evidence to support - that at some unspecified point in time Sergeant Castro was transferred from Detective Sergeant to Traffic Sergeant and another officer was given the Detective Sergeant position.  Rodriguez has not identified the other officer, the person who made the decision to transfer Castro, nor provided any evidence establishing the circumstances surrounding the transfer or whether it could be considered an adverse employment action.  Moreover, Rodriguez's bald statement does not allege any hostile work environment harassment or national origin discrimination.  Similarly, Rodriguez's unsupported statement that an African-American officer sued CPD at some unspecified point in time is not sufficient to establish a wide-spread practice of condoning national origin harassment or discrimination.

There is no evidence of a widespread practice of ignoring complaints.  Instead, the evidence is to the contrary - as soon as CPD learned of Rodriguez's complaint, it conducted a lengthy and detailed investigation.  Second, Rodriguez's theory is really a challenge to the outcome of his internal affairs investigation.  He disagrees with the finding and suggests that the City and CPD should have conducted a follow up investigation.  However, he has presented no evidence establishing any deficiencies in the investigation, nor has he shown that anyone at CPD - such as Graham - was aware of any alleged bias on the part of the investigator.  He has also failed to provide any legal support for this theory.  Moreover, the evidence before the Court suggests that any harassment against Rodriguez had ceased several months before the investigation even commenced, and Rodriguez does not allege any further harassment after the investigation concluded.  Without more, the Court finds that there is no evidence of a custom of national origin harassment, or of ignoring complaints of such harassment sufficient to create a genuine issue of fact relating to that claim.[19]

---

[19]This same analysis applies to the extent Rodriguez has asserted a custom, policy, or practice of failing to train CPD officers in matters of national origin discrimination.  "Only where a municipality's failure to train its employees ... evidences a 'deliberate indifference' to the rights of its inhabitants can ... a shortcoming be ... city 'policy or custom' ... actionable under § 1983."  City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205 (1989). To establish deliberate indifference, "a plaintiff must present some evidence that the [municipal defendants] knew of a need to train and/or supervise in a particular area and the [municipal defendants] made a deliberate choice not to take any action."  Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).  "[S]ince a finding of deliberate indifference requires a finding of the [municipal defendants'] subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains such evidence, albeit circumstantial, of such subjective awareness."  McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).  There is no evidence of prior incidents or a widespread (continued...)

Finally, there is no evidence that the national origin harassment - or any perceived rejection of complaints of such harassment - was committed or condoned by a City or CPD official with "final policymaking authority."  A local government body can be held liable for the acts or decision of "a municipal official with final policymaking authority in the area of the act or decision."  Cuesta, 285 F.3d at 968.  Rodriguez alleges that he was subjected to a hostile work environment by Radi and that Chief Graham explicitly condoned the harassment by not further investigating Rodriguez's claims after the internal affairs investigation was completed.

It is apparent from the record that Radi does not qualify as an official with "final policymaking authority."  "[F]inal policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review.'"  Quinn v. Monroe County, 330 F.3d 1320, 1325 (11th Cir.2003).  Pursuant to the City and CPD's express policy, any complaints concerning Radi's decisions and actions with regard to any alleged harassment were subject to review by the Administrative Services Director.  In fact, as soon as Rodriguez lodged his complaint against Radi, the City and CPD conducted a five month investigation of the allegations.  Clearly, then, Radi

_____

[19](...continued)
problem of national origin harassment or discrimination such that would put the City and CPD on notice of a need to train its employees.  See Gold, 151 F.3d at 1351-52.  Moreover, there is no evidence before the Court that any alleged failure to train caused any City or CPD employee to violate Rodriguez's - or any other CPD employees - equal protection rights.  Id. at 1350 (holding that a failure to train claim under § 1983 only exists where the municipal policy causes an employee to violate a citizen's constitutional rights).

does not qualify as an official with "final policymaking authority" for purposes of imposing liability on the City under § 1983. Id. at 1326.

With respect to Chief Graham, there is no evidence in the record from which the Court can definitively ascertain whether or not he held final policymaking authority with respect to complaints of harassment and/or discrimination - in particular, neither side has made clear whether Rodriguez could have further appealed the results of the internal affairs complaint. Viewing the evidence in the light most favorable to Rodriguez, the Court will therefore hold for summary judgment purposes that Chief Graham was the final policymaker with respect to the investigation of Radi. Regardless, this claim fails because there is no evidence that Chief Graham took any actions or made any decisions that violated Rodriguez's constitutional rights. It is clear that Rodriguez is simply upset with the result of the investigation and, without any authority or evidence in support (other than his own blanket statements of bias), argues that Chief Graham should have thrown out the investigation and conducted further inquiry - and that Chief Graham's acceptance of the investigator's conclusions constitutes a custom, policy, or practice of ignoring complaints of national origin discrimination and harassment.

In order to prevail on such a theory - which is akin to a theory of deliberate indifference - Rodriguez would have to establish that Chief Graham, in his role as official policymaker, refused to take any action in the face of evidence that the need for action - in this case the need to conduct additional investigations into Radi's alleged harassment - was "so obvious, and the inadequancy [of existing practice] so likely to result in the

violation of constitutional rights, that the policymake[r] . . . can reasonably be said to have been deliberately indifferent to the need." Canton v. Harris, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). The evidence simply does not support such a claim. To the contrary, the evidence demonstrates that the City and CPD have a policy of taking such complaints seriously and investigating them thoroughly, and there is no evidence that Graham was aware of any possible bias on the part of the investigator. To demand that Chief Graham overturn the investigator's conclusion at the end of a five month investigation, and conduct yet another investigation - without any evidence or legal argument to support such a theory - is not sufficient to survive summary judgment.[20] See Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1555 (11th Cir. 1997) ("Although [the plaintiff] remains unsatisfied with [the defendant's] resolution of her complaint, we have never stated - nor does [the plaintiff] propose that we have ever held - that a complainant in a discrimination action has a right to the remedy of her choice.").

After a careful review of the record, the Court can find no evidence of any policy or custom of the City that could have resulted in a hostile work environment based on national origin. Accordingly, summary judgment shall be granted on Count II.

## B. Count III - Fourteenth Amendment Procedural Due Process Claim

In Count III of his Amended Complaint, Rodriguez alleges that:

---

[20]Similarly, there is no evidence establishing that Graham acted or failed to act to properly train CPD employees with respect to national origin discrimination and harassment, or was deliberately indifferent to any need to provide training.

> personnel policies and practices of CLERMONT and/or the CPD
> granted RODRIGUEZ a right and/or entitlement to employment
> promotion, selection as a Field Training Officer, and/or pay
> raises based upon merit and personnel evaluations.
> Furthermore, the customs and practices of CLERMONT and/or
> the CPD created a "mutually explicit understanding" so as to
> grant RODRIGUEZ a right and/or entitlement to employment
> promotion, selection as a Field Training Officer, and/or pay
> raises based upon merit and personnel evaluations.  Finally,
> RODRIGUEZ had a right to be free from stigmatizing allegations,
> that were made public and resulted in a loss of his right to further
> employment promotion, selection as a Field Training Officer,
> and/or pay raises based upon merit and personnel evaluations.

Doc. 21, ¶ 104.

Rodriguez further alleges that actions of the City of Clermont and CPD, through Radi and others, intentionally, purposefully, and willfully deprived Rodriguez of these rights and property interests, as well as his right to due process. Id. at ¶ 105-08.

A § 1983 claim alleging a denial of procedural due process under the Fourteenth Amendment requires proof of three elements: (1) a deprivation of a property interest protected by the Constitution; (2) state action; and (3) a constitutionally-inadequate process. Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003).  The City of Clermont and CPD claim they are entitled to summary judgment because Rodriguez cannot establish the first and third elements.

With respect to the first element, unless state law provides Rodriguez with a legitimate expectation of a pay raise and/or promotion to Field Training Officer,[21] he has

---

[21]Although Rodriguez uses the generic term "promotions" in his Amended Complaint, the
(continued...)

no procedural due process claim under the United States Constitution. <u>Lassiter v. Alabama A & M Univ., Bd. of Trustees</u>, 28 F.3d 1146, 1148 (11th Cir. 1994) (en banc).  <u>See</u> <u>also</u> <u>Arrington v. Helms</u>, 1438 F.3d 1336, 1348 (11th Cir. 2006) ("Property interests stem not from the Constitution, but from such sources as statutes, regulations, ordinances, and contracts.  Whether these sources create a property interest must be decided by reference to state law."); <u>Silvia v. Bieluch</u>, 351 F.3d 1045, 1047 (11th Cir. 2003) ("Property interests protected by the Constitution are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.").  A property interest can be created by an agency handbook of personnel policies, <u>Nicholson v. Gant</u>, 816 F.2d 591, 597 (11th Cir. 1987), or personnel rules, <u>Marshall v. City of Cape Coral, Fla.</u>, 797 F.2d 1555, 1559 (11th Cir. 1986).  However, "[w]hile protected property interests in continued employment can arise from the policies and practices of an institution, [ ] a property interest contrary to state law cannot arise by informal custom."  <u>Brett v. Jefferson County, Ga.</u>, 123 F.3d 1429, 1434 (11th Cir. 1997).

Rodriguez has not pointed to any Florida statute, regulation, ordinance, contract, policy, or practice establishing that he had a protected property interest in a pay raise and/or promotion to Field Training Officer.  The sum total of his argument is one sentence in his response in opposition, which merely states that "[p]laintiff had a constitutionally

---

[21](...continued)
only position he ever applied for - and the only position Rodriguez has presented any evidence on - was the Field Training Officer position.

protected property interest in both his raise and his selection as a [Field Training Officer]." (Doc. 51, p. 2). In contrast, the City of Clermont and CPD have presented the affidavit of Chief Graham, which states that "[p]ursuant to CPD Personnel Polices, merit pay raises are not automatic and are only awarded to recognize outstanding performance." Doc. 45-5, ¶ 5. Chief Graham's affidavit further recites that the decision to award promotions and appointment of officers to the position of Field Training Officer is a discretionary employment decision made by the Chief of Police. Doc. 45-5 ¶ 8. The Defendants have also submitted an excerpt from CPD's Personnel Polices, which states that:

> Pay increases within the ranges of established job classification positions shall be dependent upon specific recommendations by the department head to the City Manager. These pay increases serve only to recognize outstanding performance and continued good service on a merit basis and will not annually automatically accrue to the individual employee.

Doc. 45-5, Ex. 1.

This evidence makes clear that pay raises and promotions to Field Training Officer are completely discretionary decisions which are not created by any state law, contract, policy, or practice. Moreover, Rodriguez has made no attempt to refute this evidence. Thus, it is clear that, as a matter of law, Rodriguez did not have a protected property interest in pay raises or a promotion to Field Training Officer, and therefore the Defendants are entitled to summary judgment on Count III.[22]

---

[22] Rodriguez's claim also fails because he has not identified any process that he was due and denied. An established remedial process existed by which Rodriguez could have appealed

(continued...)

**C.      Counts IV and VI - National Origin Discrimination Claims**

In Counts IV and VI, Rodriguez asserts claims of national origin hostile work environment discrimination and disparate treatment discrimination against the City and CPD under both Title VII and the FCRA.  He premises these claims on the allegations of Radi's harassment of Rodriguez and the City's and CPD's alleged failure to properly respond to Rodriguez's complaints, his low 2007 evaluation and the resulting denial of a pay raise, and the denial of a promotion to Field Training Officer.

To establish a *prima facie* case of hostile work environment harassment under Title VII and the FCRA,[23] a plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) that the

---

[22](...continued)
both the denial of a pay raise and promotion to the City Manager and the City Commission.  It is undisputed that Rodriguez did not appeal the pay raise to the City Commission, and did not appeal the denial of the Field Training Officer position at all.  Rodriguez also has not alleged that these remedies were inadequate.  See Cotton v. Jackson, 216 F. 3d 1328, 1331 n. 2 (11th Cir. 2000) ("procedural due process violations do not even exist unless no adequate state remedies are available.").  Moreover, to the extent Rodriguez premises his claim on the statements in his 2007 evaluation concerning "Spanglish," Florida law recognizes a right of certiorari for public employees who are adversely affected by an employer's personnel action, including the alleged act of placing false and disparaging information in an employee's personnel file.  Cromer v. Crowder, 273 F. Supp. 2d 1329, 1333 (S.D. Fla. 2003).  Because certiorari review is available, Rodriguez also cannot maintain a procedural due process claim based on the statements in his evaluation.  Id.

[23]Claims brought under the FCRA are analyzed under the same framework as claims under Title VII.  Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998).

employer is responsible for such environment under either a theory of vicarious or direct liability. <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002). It is clear that the first three elements have been satisfied, and the Court has previously concluded that material issues of fact exist as to whether Radi's alleged actions are sufficiently severe or pervasive to alter the terms and conditions of Rodriguez's employment. Moreover, the City and CPD have made no argument challenging their liability for such a hostile work environment. Accordingly, to the extent the City and CPD have moved for summary judgment on Rodriguez's hostile work environment claim, this portion of their motion shall be denied.

Rodriguez has also asserted a disparate treatment claim with respect to his 2007 annual evaluation and denial of a pay raise in 2007 and the failure to promote him to Field Training Officer. <u>See</u> Doc. 21, ¶¶ 115(a), 138. It appears that Rodriguez has abandoned this portion of his Title VII and FCRA claims - he has made no argument in his summary judgment papers, and has not listed these claims in the Joint Pretrial Statement or during the December 16, 2009 pretrial conference. <u>See</u> Doc. 71, pp. 1-3. Instead, Rodriguez now lists these adverse employment actions only as part of his retaliation claims. Moreover, Rodriguez has not submitted any evidence establishing that a similarly situated CPD employee of non-Puerto Rican national origin was treated more favorably, or that an equally or lesser qualified non-Puerto Rican employee was promoted to Field Training Officer. <u>See</u> <u>Rice-Lamar v. City of Fort Lauderdale</u>, 232 F.3d 836, 842-43 (11th Cir. 2000) (setting forth *prima facie* case of disparate treatment discrimination under Title VII); <u>Wilson</u>

v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004) (setting forth *prima facie* case for failure to promote under Title VII). See also Camara v. Brinker Intern., 161 Fed. Appx. 893, 896-97 (11th Cir. Jan. 9, 2006) (affirming grant of summary judgment for employer where employee failed to establish that similarly situated employees received pay raises and were treated less severely). Accordingly, summary judgment shall be granted with respect to the disparate treatment portions of Rodriguez's Title VII and FCRA claims.

## D. Counts V and VII - Retaliation Claims

In his final two claims, Rodriguez asserts that due to his complaints about Radi, the City and CPD unlawfully retaliated against him in violation of Title VII and the FCRA by: (1) scoring his 2007 evaluation more harshly than other CPD employees; (2) denying him a pay raise in 2007; and (3) denying him a promotion to Field Training Officer. See Doc. 21, ¶¶ 130, 147.

A plaintiff establishes a *prima facie* case of retaliation under Title VII and the FCRA by showing that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was some causal relation between the two events. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir.2001). The plaintiff can establish a causal connection by presenting evidence that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir.2002) (internal quotation marks omitted). The Eleventh Circuit construes the

causal link element broadly. <u>Pennington</u>, 261 F.3d at 1266. Once the plaintiff establishes a *prima facie* case of retaliation, "the burden of production then shifts to the defendant to establish non-retaliatory reasons for the employment actions." <u>E.E.O.C. v. Reichhold Chems., Inc.</u>, 988 F.2d 1564, 1572 (11th Cir.1993). If the defendant establishes a non-retaliatory reason for the action, the burden then shifts back to the plaintiff to refute these reasons by proving that they are pretextual. <u>Id.</u> at 1572.[24]

The City and CPD challenge only the first element of Rodriguez's *prima facie* case, and argue that Rodriguez did not engage in statutorily protected activity. Rodriguez concedes that he is seeking relief under the "opposition clause" portion of Title VII's anti-retaliation provisions. <u>See</u> 42 U.S.C. § 2000e-3(a). For a plaintiff to engage in "statutorily protected expression" under the "opposition clause," he must have a "good faith, . . . reasonable belief" that the actions he is opposing would be unlawful under Title VII. <u>Weeks v. Harden Mfg. Corp.</u>, 291 F.3d 1307, 1312 (11th Cir. 2002). A "good faith, reasonable belief" has two components: (1) the plaintiff must have subjectively believed that the employer was engaging in discriminatory practices, and (2) that belief must be objectively

---

[24]This legal analysis applies to retaliation claims premised on circumstantial evidence. Rodriguez points to Chief Graham's statement to Rodriguez that he would never be promoted to Field Training Officer as direct evidence of retaliation. However, Rodriguez admitted that he has no idea why Graham made the statement, and there is no evidence that Graham made this statement in relation to Rodriguez's complaints about Radi. <u>See</u> <u>Merritt v. Dillard Paper Co.</u>, 120 F.3d 1181, 1189 (11th Cir. 1997) (defining direct evidence as "evidence, which, if believed, proves the existence of a fact in issue without inference or presumption. Evidence that only suggests discrimination [or retaliation], or that is subject to more than one interpretation, does not constitute direct evidence."

reasonable in light of the record evidence and controlling substantive law. See Butler v. Ala. DOT, 536 F.3d 1209, 1213 (11th Cir. 2008).

The record demonstrates two instances where Rodriguez complained about Radi's harassment.  The first, was when Rodriguez met with Lieutenant Blackman after Radi ordered Rodriguez to write all of the reports for the squad, and which Rodriguez contends resulted in retaliation in the form of a low evaluation and denial of pay raise.  The second was Rodriguez's March 2007 internal affairs complaint against Radi, which Rodriguez contends resulted in the denial of a promotion to Field Training Officer.  In the first instance, Rodriguez complained the same day that Radi issued his directive, and noted that Radi had humiliated and embarrassed Rodriguez based on his alleged inability to "write English."  In the second, Rodriguez complained shortly after transferring out of Radi's squad - and specifically mentioned harassment and discrimination based on his race and national origin.  This evidence is sufficient to establish that Rodriguez had a good faith, reasonable belief that the City and CPD - through Radi - were engaged in unlawful employment practices, and therefore he engaged in statutorily protected conduct. Moreover, Rodriguez had an objectively reasonable belief that the Defendants' conduct was unlawful.  This Court has already determined that Rodriguez has presented a viable hostile work environment claim.  Thus, Rodriguez's belief was "objectively reasonable in light of the facts and record presented."  Weeks, 291 F.3d at 1312.

Summary judgment shall be denied as to Counts V and VII.

**Conclusion**

Accordingly, upon due consideration, it is hereby ORDERED as follows:

(1)    Defendant Jeffrey Radi's Motion for Summary Judgment (Doc. 42) is GRANTED IN PART AND DENIED IN PART.  Summary Judgment is granted in favor of Defendant Radi and against Plaintiff Ramon Rodriguez as to that portion of Count I of the Plaintiff's Amended Complaint (Doc. 21) relating to the 2007 annual evaluation; and as to Counts II and III.  In all other respects, the motion is DENIED.

(2)    Defendants City of Clermont and City of Clermont Police Department's Motion for Summary Judgment (Doc. 45) is GRANTED IN PART AND DENIED IN PART. Summary Judgment is granted in favor of Defendants City of Clermont and City of Clermont Police Department and against Plaintiff Ramon Rodriguez as to Counts II and III of the Amended Complaint (Doc. 21), and as to the disparate treatment portions of Counts IV and VI of the Amended Complaint.  In all other respects, the motion is DENIED.

(3)    Defendant Jeffrey Radi's Motion to Strike Plaintiff's Affidavit in Support of Response to Defendant's Motion for Summary Judgment (Doc. 54) is DENIED because the affidavit is not directly contradictory to the Plaintiff's sworn deposition testimony. See Van T. Junkins and Assoc. v. U.S. Industries, Inc., 736 F.2d 656, 657 (11th Cir. 1984).

(4)    The following claims remain in this case and will proceed to jury trial not before January 25, 2010:

(A)    a claim of national origin discrimination under 42 U.S.C. § 1983 and the Fourteenth Amendment against Defendant Radi in his

individual capacity, premised on Radi's alleged creation of a hostile work environment (Count I);

(B)     hostile work environment claims against Defendants City of Clermont and City of Clermont Police Department under Title VII and the FCRA (Counts IV and VI); and

(C)     retaliation claims against Defendants City of Clermont and City of Clermont Police Department under Title VII and the FCRA, premised upon the Plaintiff's complaints against Radi (Counts V and VII).

(5)     The Clerk is directed to withhold the entry of judgment pending resolution of all remaining claims.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 31st day of December, 2009.

_____
UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record